**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **MATTHEW CALLAN** | : | **CIVIL ACTION NO.** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **DEFIBTECH, LLC** | : | |
| | : | **MAY 21, 2020** |
| **Defendant.** | : | |
| | : | |

**COMPLAINT**

**JURISDICTION AND VENUE**

1. This action arises under the Americans with Disabilities Act Amendments Act of 2008 (ADAAA), codified as amended at 42 U.S.C. § 12101 *et seq*.; the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. 46a-60, *et seq*.; and Connecticut state law.

2. The jurisdiction of this court is founded upon 28 U.S.C. §1331 (federal question) and the provisions of 28 U.S.C. §1343.

3. Venue is proper in the District of Connecticut pursuant to 28 U.S.C. §1391(b) in that the claims arose in this district and Plaintiff resides in this district.

4. Supplemental jurisdiction over Plaintiff's supplemental state law claims are invoked pursuant to 28 U.S.C. §1367 as the claims arise out of the same transaction and occurrences as Plaintiff's federal claims.

5. Costs, expert witness fees, and attorney's fees are sought pursuant to 42 U.S.C. §1988.

6. The Plaintiff received a Release of Jurisdiction on February 21, 2020.

-1-

*Sidebar (left margin):* 1000 Lafayette Boulevard, Suite 1100 ▪ Bridgeport, CT 06604 ▪ T: (203) 683-6007 ▪ F: (203) 683-9881

THE MCMINN EMPLOYMENT LAW FIRM, LLC

7.      The Plaintiff received a Notice of Right to Sue on February 24, 2020.

## THE PARTIES

8.      The Plaintiff, Matthew Callan ("Plaintiff" or "Callan") is a natural person and a resident of Madison, Connecticut.

9.      The Defendant, Defibtech, LLC ("Defendant" or "Defibtech") is a foreign limited liability company, headquartered in the State of New Jersey, is authorized to conduct business in the State of Connecticut, is registered with the State of Connecticut, and conducts substantial business in the State of Connecticut at 741 Boston Post Road, Guilford, Connecticut, where Plaintiff was employed.

## INTRODUCTION

10.     Plaintiff was a very early member of the small group that founded Defibtech, the 4th person to join Defibtech's Guilford development office in 1999. Plaintiff began contributing to the startup effort as an independent contractor, primarily as a Mechanical Design Engineer, but also as Industrial Design Consultant — Plaintiff was singularly responsible for bringing together the original team that created the basic mechanical enclosure design of Defibtech's first product, the Sentry AED.

11.     Plaintiff then played a crucial role in the effort to bring that design into a manufacturable state, by personally conceptualizing, prototyping, and proving many of the key details that made that product a success.

12.     It is significant and relevant to this case that Plaintiff was also able to fill a variety of other creatively productive roles during Defibtech's early development phase, due to his unusually varied skill set, eagerness to provide practical help, and his

uncommon ability to integrate and synthesize normally disparate fields of endeavor. For many years, Plaintiff was also Defibtech's Graphic Designer, Video Editor, and Electronics Technician, as well as its de facto Facilities Manager, Content Manager, and Language Translator, to name a few positions now filled by full-time specialists or outside contractors.

13. Then, as Defibtech stabilized and became established as a mature manufacturing company, Plaintiff transitioned to a full-time salaried Mechanical Engineering position in November 2007.

14. Plaintiff continued to work at, for, and with Defibtech until his abrupt and wrongful termination from the company on February 19, 2019 — concluding twenty years of dedicated service in a way that would shock the conscience of any reasonable juror.

15. The Plaintiff suffers from Bipolar II Disorder and ADHD/Predominantly Inattentive. Both are covered disabilities under the Americans with Disabilities Act Amendments Act (ADAAA).

16. Both medical conditions are commonly marked by heightened sensitivity to external environmental stimuli, along with a lowered tolerance threshold of that stimuli, as compared to the general public. A variety of difficulties coping with common tasks of daily living and with navigating common interactions with the external world can also be present. The severity of difficulty and impairment will depend on the individual and the degree of accumulated stress load at any given time.

17.     If not managed carefully and deliberately, these conditions can result in severe and debilitating anxiety, reduced personal and professional functionality, and other difficult symptomology for the afflicted individual.  The result can also sometimes lead to behaviors and interactions that may fall somewhat outside the range of familiar "norms."

18.     This predictable outcome is exactly what occurred in this case, despite Plaintiff's deliberate and focused efforts to keep it from occurring by explicitly and repeatedly requesting an accommodation from multiple members of Defibtech's senior management, including the current CEO.

19.     Specifically, on February 2, 2019, Plaintiff was accused of committing a mild and harmless breach of unwritten and essentially subjective social protocol, while in an acutely agitated mental state associated with his known disability, a state triggered by Defibtech's specific actions, and then exacerbated by Defibtech's negligent inaction, its shocking indifference to Plaintiff's confided mental health needs, and its abject failure to follow either the letter or the spirit of specific civil disability rights legislation designed to address exactly this situation, and to guide it toward an equitable outcome for all parties.

20.     Within hours of Plaintiff's harmless, jocular, email message, and less than 24 hours after submitting a formalized, written Confirmation of a Request for Accommodation form to Defibtech, Plaintiff had been physically banned from company property and locked out of his own email account. Approximately two weeks later, Plaintiff was terminated — with a series of disingenuous, inaccurate, and statutorily defective disciplinary documents used as pretextual justification.

-4-

21.     At no point did Plaintiff's behaviors or interactions rise to the level of legitimate, non-discriminatory reason for termination. There was no business necessity, no direct, imminent, or implied threat, no performance deficiency, and most importantly to this case, no actually aggressive, attacking, disparaging, intimidating, hostile, harassing, or otherwise objectively unacceptable conduct.

## FACTUAL ALLEGATIONS

22.     Bipolar II and ADHD/PI are both conditions often marked by extra-ordinarily creative thinking which, if well-channeled toward a particular goal, can lead to extra-ordinarily productive activity. In the ideal case, this combination can lead to extraordinary results.

23.     Defibtech fostered an unusually open, collegial, and convivial workplace that Defibtech has historically been known for.

24.     Plaintiff always performed the duties of his position in a satisfactory manner and achieved positive results, at minimum — most often well beyond minimum. For instance, in Plaintiff's last full year at Defibtech, he received a "3+" overall score, indicating performance between "Exceeded Expectations" and "Met Expectations" along with glowing performance comments from the reviewers.

25.     Plaintiff's reviews for the prior 3 years are remarkably similar, meeting or exceeding expectations at all times, and all show ample evidence of his distinctly helpful and cooperative character.

26.     Two out of the three individuals to have held the position Director of Engineering in Defibtech's history, both during Defibtech's critical maturation phase, have explicitly identified Plaintiff as tied for the #1 highest-performing and/or the #1

most-valuable engineering staff member under their supervision, during the entire span of their respective times at the company.

27. Gang Wu ("Wu") was Director of Engineering from 2014 to 2015. In his short time at the company, Wu rated Plaintiff's performance "Exceeded Expectations" on his February 2015 review form, one of only two engineering department employees to receive this highest rating that year.

28. Jerry Illowite ("Illowite") was Director of Engineering for approximately 5 years, from 2009 to 2014. A formal review process had not yet been established by the time Illowite left Defibtech, but, during a farewell event Illowite stated to Plaintiff, paraphrased, "if at any point in the last five years I was told I had to do the common 'culling of ranks' exercise, (i.e., rank workers in terms of value, and then get rid of the bottom 10%), you'd be tied for #1, every time."

**A. Triggering Action, Leading to Pretextual Event and Wrongful Termination**

29. On November 26, 2019, Matt Valentine ("Valentine"), Vice President of Engineering informed Plaintiff and the others in the Engineering Department that the entire department would be relocated to the first floor of the building — a transition to begin immediately and to be substantially completed by the end of the year.

**B. Background and Context**

30. Plaintiff worked in the 2nd-floor office space for approximately thirteen years, beginning at the point that Defibtech essentially graduated from a hopeful startup to viable ongoing business and moved into the professional office building at 741 Boston Post Road. At that time, the entire company of approximately 12 employees

occupied Suite #201. Over time, the company expanded into other areas of the building, with Suite #201 eventually becoming home to the engineering department, exclusively.

31.    Over the course of those 13 years, Plaintiff had accumulated a vast and varied collection of tools, equipment, parts, materials, etc. for use in the evolved practice of his position as a highly experienced and unusually capable engineer-of-all-trades. This material was distributed over two physically separated workspaces approximately 75 feet apart: a semi-private office area and a large lab/workshop area.

32.    Plaintiff had long found this physical separation of work areas to be a significant source of stress, due to the spatial/temporal processing and object management difficulties often associated with the ADHD/PI diagnosis. It was a daily stressful struggle for Plaintiff to keep track of the tools, materials, and equipment required for his duties because they were quite often required to be simultaneously available in 2 different places in order to complete tasks efficiently. Most people might be able to manage this problem as a matter of course, but for Plaintiff, due to his disability, he had an exceedingly difficult, frustrating, and stressful experience attempting to do so.

33.    Intentionally, Plaintiff's semi-private office area had long been established in the far corner of the building, as far removed from daily, disturbing, office traffic and noise as possible, and that it was entirely enclosed by 7-foot tall office panels, with a door. As Defibtech grew busier and more crowded over the years, Plaintiff, with the tacit assistance of the founding Defibtech leadership, had taken deliberate steps

-7-

to improvise a working environment that worked well for him and for the company; simple arrangements that required no particular hardship for the company, or expensive equipment.

### C.  Changes to Plaintiff's Workspace

34.    In 2018, Valentine informed Plaintiff that he would be sharing an open office with two other workers and that his lab space would be split into two small and inconvenient spaces: one across the hall from the new office area, the other even further away and even more inconvenient, in the basement of the building.

### D.  The Failures Begin

35.    Knowing that this proposed arrangement would increase Plaintiff's anxiety and possibly trigger other symptoms of his disabilities on two fronts, potentially to the point where he would become functionally impaired, Plaintiff explicitly described to Valentine, via multiple email exchanges from December 4, 2018, through December 14, 2018, that the proposed new workspace plan had worrisome implications for his own needs, as well as for the greater needs of the company.

36.    On December 9, 2018, Plaintiff emailed Valentine, subject, RE: Moving Plans, and stated his concerns about the moving plans as related to his disability. Specifically, Plaintiff stated that the new office environment proposal "does not meet specific … personal requirements for being able to function in an office environment."

37.    Previously, as the first moving phase occurred in late 2018, Plaintiff did, in fact, begin experiencing increased stress and anxiety causally related to the move to the new working environment, which would require him — for the first time — to share an open office, with two other workers. It would also introduce significantly more

physical separation distance between his closely related work areas. This separation distance was already a significant source of stress for Plaintiff because of the time, space, and external object management difficulties associated with his ADHD/PI diagnosis.

**E.  Valentine's Second Chance, and Failure**

38.   Concerned with growing anxiety about the impending changes, on December 19, 2018, Plaintiff met with Valentine in person, in Valentine's office, to again explain why the proposed arrangement would not work for him, in sufficient detail, making a request for a reasonable accommodation pursuant to the ADAAA.

39.   At this meeting, Plaintiff thoughtfully proposed alternative solutions that would be more suitable given his disabilities, but similar to before, his reasonable entreaty was disregarded by Valentine, for the second time. Valentine neither accommodated Plaintiff nor engaged in the interactive process to determine what type of accommodation was reasonable under the changing circumstances.

**F.  Human Resources Becomes Involved, and Fails**

40.   After receiving no indication of forthcoming assistance from Valentine, on December 27, 2018, Plaintiff met with Chrissy Falcha, Sr Manager, Human Resources (referred to variously as "Falcha," or "HR"). At this meeting, Plaintiff reiterated his request for an accommodation, in even more explicit detail.

41.   Plaintiff, in Falcha's office, pointedly stated that he had "diagnosed conditions" and that he was "making a request for a reasonable accommodation under the provisions of the ADA."

Falcha promised to meet with Valentine as soon as possible about Plaintiff's requests, who had previously failed to address Plaintiff's requests for accommodation. A full seven days later, on January 4, 2019, HR finally sent Plaintiff a form titled Confirmation of Request for Accommodation. Following Plaintiff's December 27, 2018 meeting with Falcha, on December 28, Plaintiff emailed Valentine, as a courtesy, to inform him that he had just met with HR regarding his accommodation request. Plaintiff's email to Valentine stated, "had a talk with Chrissy yesterday, similar to ours the other day, but with more emphasis and a little more detail on my main concern (…how to **accommodate** my own specific environmental needs ….)"

42.    After this, for a third time, Valentine failed to address Plaintiff's repeated requests for an accommodation — or to even respond in any way, in person or in writing.

### G. Valentine's Prior Failure

43.    Previously, Plaintiff requested accommodation on August 6, 2017, in response to Valentine's direct instruction "to vacate [his] office."

44.    Valentine did not respond to Plaintiff's August 6, 2017 accommodation request, and never again mentioned the need for Plaintiff to "vacate [his] office."

45.    Rather, Valentine addressed Plaintiff's request seven months later, on Plaintiff's March 1, 2018 performance review, by including the comment (or "retaliatory criticism") "Matt was not accommodating when asked to vacate his office."

46.    Plaintiff was not able to dispute, correct, contextualize, or add comments of his own to address Valentine's criticism because the clear and conspicuous language

notifying Plaintiff of his right to do was absent from Valentine's review form, as is explicitly required by Conn. Gen. Stat. § 31-128e.

**H.  Plaintiff Attempts To Survive On His Own**

47.  On or about January 7, 2019, overwhelmed by the enormity of the moving transition, and increasingly panicked by the awareness that the new work environment developing around Plaintiff was not suitable for his disability-related challenges, and since Plaintiff had not received any attention or assistance from management to facilitate his transition into the new environment, and could see that no alternative to the shared office space would be forthcoming, he arrived at a partial solution on his own by deciding to work, as best he could, exclusively in 104.

48.   "104" refers here to the very small room across the hall from the new engineering office space, which had been designated to be 1⁄2 of Plaintiff's new lab space. Plaintiff had determined that even though 104 was clearly inadequate, on many levels, working exclusively in this room was the only way he would be able to function at all, given the available options and the lack of accommodation from Valentine, or anyone else.

49.  At no point did Valentine visit Plaintiff's makeshift workspace in 104 to discuss the situation or propose an alternative solution. Valentine's office is approximately 60 feet away from that workspace.

**I.  Falcha's Empty Overture**

50.  On January 15, 2019, Falcha (HR) sent an email to Plaintiff, ostensibly expressing interest in following up on Plaintiff's previous, multiple requests for accommodation. Plaintiff replied,

"[f]or sure I'm struggling right now. What I thought I could make work clearly won't, so I've been focusing on making the space in 104 serve my needs …"

51.    Falcha (HR) did not respond in any way, in writing, or person. Falcha's office, similar to Valentine's, is in close proximity to 104 — approximately 100 feet from 104.

**J.  Reinhardt's Failure to Accommodate, From the Top**

52.    Two weeks later, finding no reliable indication of interest or forthcoming assistance from Valentine or Falcha, Plaintiff sent another explicit **request for an accommodation**, to Defibtech's current President and CEO, Bob Reinhardt ("Reinhardt").

53.    Specifically, on Thursday, January 31, 2019, Plaintiff wrote: "Bob - before too much more planning takes place for the newly acquired 1st flr (*sic*) space I'd like to make sure that my own specific and unique needs are being adequately considered and accommodated."  In this message, Plaintiff also invited Reinhardt to visit his tiny makeshift work area in 104.

54.    Reinhardt did not visit, or respond in any way – unless Plaintiff's subsequent and apparently proximate termination is to be considered a response. Note that Reinhardt's office is approximately 120 feet away from 104.

55.    Similar to Valentine and Falcha, Reinhardt utterly failed to engage in the interactive process.

**K. Pretextual Event Immediately Following Submission of Form**

56.   On Friday, February 1, 2019, Plaintiff hand-delivered his completed Confirmation of Request for Accommodation form to Falcha (HR).

57.   By this time, the accumulated stress of sorting and moving a substantial amount of equipment, the lack of a sufficient and suitable workspace, and the conspicuous silence from management regarding his acute struggle had taken its toll.

58.   As might have been predicted given Plaintiff's diagnosed challenges, and as could have been easily avoided with even a modicum of sincere accommodation effort, the combination of obvious stressors had left Plaintiff in an acutely anxious, agitated, and perhaps hypomanic state.

59.   Falcha's Confirmation of Request for Accommodation form appeared not to be a sincere and authentic attempt to collect information needed for the purpose of actually addressing Plaintiff's request.

60.   Indeed, all the information needed to begin a meaningful and legally required accommodation discussion had already been repeatedly expressed by Plaintiff, to Valentine, and Falcha, in person, in writing, and detail, beginning almost two months prior. And only a day before submitting the form, to Reinhardt, currently Defibtech's CEO.

61.   Nonetheless, Plaintiff answered all the questions in revealing detail, including specific and quantified specifications for the accommodations that would work for his disclosed disabilities, and at the same time allow him to maximize his productivity for the company.

62.    In less than 24 hours after hand-delivering his completed Confirmation of Request for Accommodation form to Falcha (HR), and with no accommodation in place, Plaintiff had been locked out of access to his work computer, email account, and to company property — he had been instructed by HR that he was not to appear on company property on the next workday, Monday, February 4, 2019.

63.    Plaintiff had been locked out of <u>all</u> company access for a clearly jocular reply to a group email conversation that he had sent the night before while working late on several company projects and catching up on email backlog. It was an impulsive message, sent in the moment, and with the best of intentions. And it was a silly, joking message, on its face — not malicious and "disparaging" as would be portrayed later by Falcha's "Final Warning".

64.    Plaintiff's message also clearly exhibits hallmark symptomology of his triggered disability.

**L.  More Requests for Accommodation, Again Ignored by Falcha, Reinhardt, and Valentine**

65.    Following the above event, on February 4, 2019, Plaintiff again tried to explicitly explain his current state of mind and his immediately acute mental health difficulties to HR. Specifically, he stated, in an email to HR, sent from his personal email account explaining verbatim,

> the message I sent was directly related to the accommodation request I made in December just before the move. After that, I mentioned to you that I was struggling, but I didn't want to make a big deal about it and have been trying to make the best of this situation. But it was really bad for me (it still is pretty bad)...And last night I realized that at some point in the last month I ran out of the Lithium that I take to help control the run-away process…

-14-

66.    Plaintiff further explained that "[t]his episode is one possible outcome [he] was looking to avoid by requesting a workspace that would work for [him]."

67.    Plaintiff also wrote a lengthy explanation for his joking message to Defibtech's current President and CEO, Robert Reinhardt, on February 3, 2019. In this email, Plaintiff carefully detailed the elaborate intended ideas and multiple levels of subtext behind his joke. He also shared his explanation with Valentine and two other engineering department managers.

68.    Plaintiff then followed that message on February 4, 2019, with a short note to Reinhardt, stating:

> Bob, The thing I left out of my message yesterday was an apology, first and above the convoluted explanation. I'm really sorry for this distraction. Also, I know even the explanation isn't perfectly rational; last night I think I discovered why my head is spinning out a bit right now...." (referring to Plaintiff's awareness that he had inadvertently run out of lithium at some point during the distracting and chaotic office moving period immediately preceding the pretextual event).

69.    On February 5, 2019 Plaintiff was allowed back onto Defibtech property to attend a meeting with Falcha (HR) at 11:00 AM.

70.    Having found no audience in Valentine or Reinhardt, Plaintiff sought out Kei Yoshizawa, COO of Defibtech ("Yoshizawa"), in Yoshizawa's office at 9:00 AM on February 5, 2019 again explaining the situation, including the fact that he had been

diagnosed with Bipolar II disorder, and that his previous multiple requests for ADA accommodations had unfortunately gone unanswered.

71.   Plaintiff explained that he suspected there was a plan in place to fire him at the 11:00 AM meeting, and that this would likely be a violation of the ADA, due to the facts and circumstances of the situation. After this discussion, Yoshizawa immediately discussed the matter with HR and others. At 10:00 AM Plaintiff received a message from HR that the 11:00 AM meeting would be postponed to 1:00 PM.

72.   On February 5, 2019, at 1:00 PM, Falcha (HR) presented Plaintiff with a "Final Warning." During this meeting Plaintiff again explained how moving to the new location was causing him substantial stress, and to act out of character. He further reminded Falcha of his email message, of January 18, 2019, stating that he had been "struggling." He also mentioned the suicidal ideation he endured on two different days, before finding relief in his partial solution of working exclusively in 104.

73.   On February 6, 2019, as a condition of the restoration of his access to his own email account and continued employment at Defibtech, Plaintiff was required to author a company-wide apology for his harmless email message, which was then extensively edited by HR to remove any and all of the explanatory narrative Plaintiff wished to provide to his coworkers.

**M. Final Events— Falcha's 2nd Empty Accommodation Overture, Withdrawn and Substituted with Termination**

74.   On Monday, February 11, 2019, Falcha (HR) sent Plaintiff an email invitation to attend a meeting on Friday, February 15, 2019, at 2:30 PM. The meeting subject

was "Accommodation Request Follow Up." Falcha wrote, "I want to meet and review some follow up questions that I have regarding your accommodation confirmation form that you gave to me on 2/1."

75.   At 1:00 PM on the day of the 2:30 PM meeting, Friday, February 15, 2019, Falcha sent Plaintiff an abrupt cancellation notice, without explanation, or offer to reschedule.

76.   Plaintiff then contacted Falcha with repeated requests to reschedule the Accommodation Request Follow Up meeting over the next three days. Falcha did not respond to any of those requests.

77.   On February 19, 2019, Falcha sent Plaintiff another email invitation to attend a meeting, to be held 20 minutes later on that same day, at 3:00 PM. The meeting was now titled, "Follow Up Meeting."

78.   When Falcha would not assure Plaintiff that the 3:00 PM meeting was <u>not</u> intended to be a termination meeting, Plaintiff stated to Falcha: "I'm sorry, but I will not be able to attend. I want a witness present, so I'll be back with representation."

79.   Plaintiff then left the building. In the parking lot, he attempted to decline the meeting invitation, from his cellular phone but found that access to his email account had already been blocked by 3:05 PM. He then called a coworker, asking for that person to deliver his message to the meeting attendants in person.

80.   Not only was Defibtech's IT Department prepared ahead of time to shut off Plaintiff's email access, promptly at 3:00 PM but the building owner's Maintenance Department had also been well prepared ahead of time to physically change the locks on 2 storage rooms in the building's basement that very evening.

THE MCMINN EMPLOYMENT LAW FIRM, LLC

81.   On February 19, 2019, Plaintiff was wrongfully terminated from his position.

82.   None of the documentation related to Plaintiff's termination contains a notice of his right to offer written rebuttal and/or explanation, as a permanent part of his employment record, as required by Conn. Gen. Stat. § 31-128e. None of this documentation shows Plaintiff's signature or any other acknowledgment of receipt.

83.   On February 5, 2019, Falcha wrote and placed a memorandum in Plaintiff's personnel file titled "Final Warning," predicated on Valentine's February 23, 2017 "Written Warning for Unacceptable Personal Conduct," which was disingenuous, inaccurate, untrue, and issued by defective process that materially denied Plaintiff his specific right to offer explanation and context to the record, and thereby correct it.

84.   In her "Final Warning," Falcha wrote "...you have a history of unacceptable personal conduct. This was documented in the Written Warning that you were issued on February 23, 2017."

85.   Falcha's "Final Warning" contains similarly disingenuous and inaccurate assertions about Plaintiff's actions, intent, and by extension, about his character, and that it was also issued by defective process that materially denied him his specific right to offer explanation and context to the record.

86.   Falcha's "Final Warning" in effect declares Plaintiff guilty of harassment, a very serious act.  Harassment is a very serious offense specifically reserved for conduct related to a victimized person's protected class status. This definition is explicitly detailed in Defibtech's Employee Handbook.  Plaintiff's joking message was not harassment.

87.   Falcha knew that Defibtech's published policy is to investigate all harassment issues "actively" and "with care" and also "...if it is determined that harassment has occurred, Defibtech will take appropriate disciplinary action against the offending party… ."

88.   Falcha's "Final Warning" also makes other statements of serious offense against Plaintiff such as "on February 2, 2019, you sent the enclosed email communication containing false and disparaging statements regarding another employee," "Personal attacks on other coworkers are not acceptable workplace behavior. The comments you made are disparaging, false, and had the impact of making others feel uncomfortable."

89.   And yet, Falcha's "Final Warning" rigorously asserts that Plainitff's joke was a malicious attack, intended to be believed as a literally true statement. Falcha then made the same strong, unyielding assertion, in person, when she presented Plaintiff with her "Final Warning" on February 5, 2019, even after Plaintiff attempted to clarify it for her.

90.   Plaintiff's awareness of his statutory right to add an explanation, correction, and clarifying context surrounding an event for which he was being disciplined, on grounds that were inaccurate, was again withheld from him by Falcha's omission of the clear and conspicuous notice required by Conn. Gen. Stat. § 31-128e.

91.   Falcha's violation of "Final Warning," does not contain notice of Plaintiff's right to a written rebuttal, as required by Conn. Gen. Stat. § 31-128e and Falcha also failed to provide Plaintiff with this document "not more than 1 business day after" it was issued, as required, pursuant to Conn. Gen. Stat. § 31-128b.

-19-

## COUNT ONE

### VIOLATION OF THE ADAAA - DISABILITY DISCRIMINATION

92.    Plaintiff hereby incorporates Paragraphs 1-91, with the same force and impact as if fully set forth herein.

93.    Plaintiff suffers from Bipolar II Disorder and ADHD/Predominantly inattentive.

94.    Defibtech treated Plaintiff in a disparate manner in the terms and conditions of his employment based upon his disability, including, but not limited to the following:

      i.   On February 5, 2019, issuing the Plaintiff a "Final Warning"; and

      ii.   On February 19, 2019, wrongfully terminating the Plaintiff.

95.    As a result of his wrongful discharge, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

96.    Plaintiff seeks compensatory and punitive damages for Defendant's misconduct.

## COUNT TWO

### VIOLATION OF THE ADAAA - DISABILITY DISCRIMINATION, FAILURE TO ACCOMMODATE

97.    Plaintiff incorporates paragraphs 1-96, with the same force and impact as if fully set forth herein at length.

98.    Plaintiff suffers from Bipolar II Disorder and ADHD/Predominantly inattentive.

99.    Defibtech failed to accommodate the Plaintiff's known disability, by, among other things:

      i.    Failing to engage in the interactive process, despite knowing or reasonably

should have known of Plaintiff's disability;

ii.   Failing to accommodate Plaintiff's disability after several requests for an
      accommodation; and

iii.  Terminating Plaintiff's employment on February 19, 2019.

100.   As a result of his wrongful discharge, Plaintiff has suffered and will continue to
       suffer damages including but not limited to lost wages, fringe benefits, health
       insurance, emotional and psychological distress, stress, anxiety, and loss of the
       ability to enjoy life's pleasures and activities.

101.   Plaintiff seeks compensatory and punitive damages for Defendant's misconduct.

## COUNT THREE

## VIOLATION OF THE ADAAA - RETALIATION

102.   Plaintiff incorporates paragraphs 1-101, with the same force and impact as if fully
       set forth herein at length.

103.   Among other factors that motivated Defibtech's termination of Mr. Callan was
       retaliation due to his multiple requests and persistence for an accommodation.

104.    As a result of his wrongful discharge, Plaintiff has suffered and will continue to
       suffer damages including but not limited to lost wages, fringe benefits, health
       insurance, emotional and psychological distress, stress, anxiety, and loss of the
       ability to enjoy life's pleasures and activities.

105.   Plaintiff seeks compensatory and punitive damages for Defendant's misconduct.

## COUNT FOUR

### VIOLATION OF CONN. GEN. STAT. § 46A60(B)(1)
### DISABILITY DISCRIMINATION

106.   Plaintiff hereby incorporates Paragraphs 1-105 with the same force and impact as if set forth in full herein.

107.   Plaintiff suffers from Bipolar II Disorder and ADHD/Predominantly inattentive.

108.   Defibtech treated Plaintiff in a disparate manner in the terms and conditions of his employment based upon his disability.

109.   As a result of his wrongful discharge, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

110.   Plaintiff seeks compensatory and punitive damages for Defendant's misconduct.

## COUNT FIVE

### VIOLATION OF CONN. GEN. STAT. § 46A60(B)(1)
### DISABILITY DISCRIMINATION, FAILURE TO ACCOMMODATE

111.   Plaintiff hereby incorporates Paragraphs 1-110 with the same force and impact as if set forth in full herein.

112.   Plaintiff suffers from Bipolar II Disorder and ADHD/Predominantly inattentive.

113.   Defibtech failed to engage in the interactive process, failed to accommodate Plaintiff, and terminated his employment on February 19, 2019.

114.   As a result of his wrongful discharge, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health

-22-

insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

115.    Plaintiff seeks compensatory and punitive damages for Defendant's misconduct.


## COUNT SIX

### VIOLATION OF CONN. GEN. STAT. § 46A60(B)(4)
### RETALIATION

116.    Plaintiff incorporates paragraphs 1-115, with the same force and impact as if fully set forth herein at length.

117.    Among other factors that motivated Defibtech's termination of Mr. Callan was retaliation due to his multiple requests and persistence for an accommodation.

118.     As a result of his wrongful discharge, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

119.    Plaintiff seeks compensatory and punitive damages for Defendant's misconduct.

### COUNT SEVEN

### DEFAMATION OF CHARACTER,
### LIBEL PER SE

120.    Plaintiff incorporates paragraphs 1-119, with the same force and impact as if fully set forth herein at length.

121.    The Defendant published a writing to a third party, including, but not limited to:

    i.    Writing in a business document that Callan had a "history of unacceptable personal conduct."

-23-

ii.    Declaring Plaintiff guilty of harassment;

iii.    Falsely accusing the Plaintiff of an email communication containing false and disparaging statements regarding another employee," stating, "Personal attacks on other coworkers are not acceptable workplace behavior. The comments you made are disparaging, false, and had the impact of making others feel uncomfortable."

122.    The writing identified the Plaintiff, such that it would be reasonably understood that it was about the Plaintiff.

123.    The writing was defamatory to the Plaintiff.

124.    The publication caused harm to the professional reputation of the Plaintiff as it charges improper conduct or lack of skill or integrity in Plaintiff's business and is of such a nature that it is calculated to cause injury to his profession or business.

125.    As a result of his wrongful discharge, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

126.    Plaintiff seeks compensatory and punitive damages for Defendant's misconduct.

## COUNT EIGHT

### DEFAMATION OF CHARACTER, LIBEL PER QUOD

127.    Plaintiff incorporates paragraphs 1-126, with the same force and impact as if fully set forth herein at length.

128.    The Defendant published a writing to a third party, including, but not limited to:

i.   Writing in a business document that Callan had a "history of unacceptable personal conduct."

ii.  Declaring Plaintiff guilty of harassment;

iii. Falsely accusing the Plaintiff of an email communication containing false and disparaging statements regarding another employee," stating, "Personal attacks on other coworkers are not acceptable workplace behavior. The comments you made are disparaging, false, and had the impact of making others feel uncomfortable."

129. The writing identified the Plaintiff, such that it would be reasonably understood that it was about the Plaintiff.

130. The writing was defamatory to the Plaintiff.

131. The publication caused harm to the professional reputation of the Plaintiff as it charges improper conduct or lack of skill or integrity in Plaintiff's business and is of such a nature that it is calculated to cause injury to his profession or business.

132. As a result of his wrongful discharge, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

133. Plaintiff seeks compensatory and punitive damages for Defendant's misconduct.

## COUNT NINE

### NEGLIGENCE PER SE

134.    Plaintiff incorporates paragraphs 1-133, with the same force and impact as if fully
set forth herein at length.

135.    Defendant was negligent per se in violation the Connecticut Personnel Files Act,
including, by among other things,

     i.    Not permitting Plaintiff to be able to dispute, correct, contextualize, or add
comments of his own to address inappropriate comments in his review;

     ii.    None of the documentation related to Plaintiff's termination contains a
notice of his right to offer written rebuttal and/or explanation, as a
permanent part of his employment record;

     iii.    Not permitting Plaintiff to add explanation, correction, and clarifying
context surrounding an event for which he was being disciplined, on
grounds that were inaccurate, was again withheld from him by Falcha's
omission of the clear and conspicuous notice required by Conn. Gen. Stat.
§ 31-128e; and

     iv.    Falcha's violation of "Final Warning," does not contain notice of Plaintiff's
right to a written rebuttal, as required by Conn. Gen. Stat. § 31-128e, and
Falcha failed to provide Plaintiff with this document "not more than 1
business day after" it was issued, as required, pursuant to Conn. Gen. Stat.
§ 31-128b.

136.    As a result of Defendant's negligence, Plaintiff was terminated and has suffered

and will continue to suffer damages including but not limited to lost wages, fringe

benefits, health insurance, emotional and psychological distress, stress, anxiety, and

loss of the ability to enjoy life's pleasures and activities.

137.    Plaintiff seeks compensatory and punitive damages for Defendant's misconduct.

**PRAYER FOR RELIEF**

Wherefore the Plaintiff prays that this court award:

1. Money damages;

2. Costs;

3. Punitive damages, attorney fees, and expert witness fees;

4. Pre-judgment interest

5. Trial by jury; and

6. Such other relief as the Court deems just, fair, and equitable.

THE PLAINTIFF,
MATTHEW CALLAN

By: _____/s/_____
        Michael C. McMinn (#ct267169)
        **THE MCMINN EMPLOYMENT**
        **LAW FIRM, LLC**
        1000 Lafayette Blvd., Suite 1100
        Bridgeport, CT 06604
        Tel: (203) 683-6007
        Fax: (203) 680-9881
        michael@mcminnemploymentlaw.com

        *COUNSEL FOR PLAINTIFF*

-27-